NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12298


BENJAMIN H. MILLER  vs.  JOANNA ISABELLA MILLER.



Middlesex.      September 6, 2017. - January 12, 2018.

Present:  Gants, C.J., Lenk, Gaziano, Budd, Cypher, &
Kafker, JJ.



Divorce and Separation, Child custody.  Minor, Custody.  Parent
and Child, Custody.




Complaint for divorce filed in the Middlesex Division of
the Probate and Family Court Department on May 20, 2013.

The case was heard by Patricia A. Gorman, J.

The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


Elaine M. Epstein (Richard M. Novitch also present) for the
husband.
Matthew P. Barach (Melinda J. Markvan also present) for the
wife.


CYPHER, J.  The husband, Benjamin H. Miller, appeals from a

Probate and Family Court judgment permitting the wife, Joanna

Isabella Miller, to remove and relocate the parties' daughter to

Germany, the wife's home country.  We have previously held that

when deciding whether removal should be permitted, the particular criteria depends on whether physical custody of the child is sole or shared.  Where the parent seeking removal has sole physical custody, his or her removal petition is analyzed using what has been called the "real advantage" standard of Yannas v. Frondistou-Yannas, 395 Mass. 704 (1985).  Where, however, the parents share physical custody, a parent's removal request is evaluated using the standard articulated in Mason v. Coleman, 447 Mass. 177 (2006), known as the "best interests" standard.  In this case, no prior custody order existed to guide the trial judge as to whether the Yannas or Mason analysis should apply.  In such circumstances, we hold that the judge must first perform a functional analysis, which may require a factual inquiry, regarding the parties' respective parenting responsibilities to determine whether it more closely approximates sole or shared custody, and then apply the corresponding standard.[1]  We also take this opportunity to

---

[1] In the concurrence's view, our adherence to the Yannas-Mason framework when deciding this case constitutes an endorsement of an overly formalistic analysis that constrains judges' discretion.  See Mason v. Coleman, 447 Mass. 177 (2006); Yannas v. Frondistou-Yannas, 395 Mass. 704 (1985).  By incorporating this functional (rather than formalistic) inquiry regarding custody into our existing framework, however, we seek to provide trial judges with more discretion when deciding these cases (beyond that inherent in a judge's application of either Yannas or Mason).  And although we do not necessarily disagree with certain of the concurrence's concerns, to the extent we must reexamine the wisdom of the Yannas-Mason framework, we wait

emphasize that the best interests of the child is always the paramount consideration in any question involving removal.

We are satisfied that the judge conducted the requisite functional analysis here, and in determining whether removal was in the child's best interests she afforded considerable weight to the benefits the proposed move to Germany would offer the wife, the child's primary caregiver.  Because we discern no abuse of discretion or error of law from the judge's consideration of those benefits, or from her ultimate conclusion that removal is in the child's best interests, we affirm the judgment below.

Background.[2]  The wife, a German citizen, and the husband, a United States citizen, were married in Tanzania in September, 2007.  Their only child, a daughter, was born in Uganda in March, 2008.  In July, 2011, the family moved to Massachusetts, where the husband's family resides, so that the husband could attend graduate school.  The parties did not intend to remain in Massachusetts and planned to leave once the husband received his graduate degree.  The wife had grown up in Germany and had never

---

to do so in a case where the issue has been raised and briefed by the parties.

[2] We present the relevant facts as found by the judge, supplementing them by the record where necessary, and reserving certain details for our discussion of the issues.  A.Z. v. B.Z., 431 Mass. 150, 151 (2000).

lived in the United States before, and the husband had not resided here in eighteen years.

The husband ultimately did not attend graduate school, however, and the parties first separated in April, 2012. During this separation, which lasted from April to August, the wife moved with the child to Germany, where they resided with the wife's mother and the child attended a German public school. The wife returned to Massachusetts with the child that August in an attempted reconciliation, but the parties separated for the final time in September, 2012. The husband filed for divorce in May, 2013, citing an irretrievable breakdown of the marriage and requesting shared custody of the child. The wife counterclaimed shortly thereafter, seeking sole custody of the child and requesting permission to permanently remove her to Germany.

Among the relevant facts found by the judge was the determination that the "[w]ife has been [the child]'s primary caregiver since birth," and has continued in that role following the parties' separation. The wife cared for the child when she was an infant, and is now the parent who "arranges and attends her medical appointments," "cares for [the child] when she is ill," "purchases the majority of her clothing, and attends all parent-teacher conferences." The judge also found that although the "[h]usband is not seeking sole physical custody of [the child,] and does not propose that he should be her primary

caregiver," the husband does participate in certain parenting tasks, and he and the child have a loving relationship.

Following their divorce filings, the parties filed a stipulation in the trial court stating that they "shall share custody" of the child. By its terms, the husband, who lives in an apartment in Watertown, has the child overnight on Mondays and Wednesdays; he also has her every Saturday, and alternates each week between dropping the child off with the wife that Saturday evening, or the following evening on Sunday. The wife has the child at all other times at the couple's former marital residence in Somerville, where the wife still resides.[3] In practice, however, the husband often travels for work, and when he does he communicates with the child infrequently, and he misses parenting time that he has not sought to make up. The judge also found that "the parties struggle to communicate effectively regarding parenting issues," and that the husband does not usually allow the wife to speak with the child when the child is in his care.

Despite their impressive professional credentials,[4] the husband and wife have both struggled financially since they

---

[3] It is uncontested that the stipulation establishes an approximate split of sixty per cent-forty per cent in parenting time, with the wife receiving the greater amount.

[4] The husband earned degrees from Harvard University and the University of Chicago, and has extensive experience working for

arrived in Massachusetts, and the judge concluded that their current parenting arrangement is "financially untenable."  The husband's salary from his current position at a Cambridge-based nonprofit is insufficient to provide for the wife and the child; he cannot meet his current expenses, which include weekly child support payments to the wife and paying for the wife and the child's health insurance.  The judge found that the wife is likewise "unable to provide for [the child] in Massachusetts." Despite her good-faith efforts to find a job -- she has applied for over 400 positions -- the wife has been unable to find one commensurate with her experience.  At the time of trial she was working part-time as a kitchen assistant making fourteen dollars per hour; beyond that, her income consisted of the husband's child support payments, supplemental nutrition assistance program benefits for the child, and periodic financial support from both the husband's and her own mother.[5]

Prior to trial, the wife was offered a well-paying job in Germany, which the judge found would enable the wife "to support herself and [the child] without child support from [the h]usband."  Beyond a livable salary, its benefits include health

---

nongovernmental organizations.  The wife likewise holds two degrees, speaks three languages, and specializes in public relations in the Middle East region.

[5] The judge found that the wife has borrowed over 100,000 euros from her mother, who "has liquidated most of her private retirement fund" to support her daughter.

insurance and "the ability to work from home most of the time." The wife expressed her intention of accepting the position if her requests for custody and removal were granted.  In contrast with Massachusetts, where the wife lacks any family or friends, a return to Germany would place the wife among her extended family.  This includes the wife's mother, with whom the child is especially close.  The child has already spent considerable time in Germany as well -- she has visited at least ten times since birth, and has attended German schools for two extended periods. The child is fluent in German, has a German passport, and has kept in regular contact with her family and friends there.

Following a three-day trial, the judge concluded that permanently relocating to Germany with the wife was in the child's best interests and granted the wife's requests for physical custody and removal.  The judgment granted the husband "parenting time with [the child] during three of the four annual vacations from school in Germany, including six consecutive weeks during each summer vacation," as well as "additional parenting time with [the child] in Germany upon reasonable notice to [the w]ife by agreement."  The husband appealed from the judgment, and we transferred his case from the Appeals Court on our own motion.

Discussion. The husband challenges the judge's removal order on two grounds.[6] First, he argues that the judge erred in applying the "real advantage" analysis of Yannas, applicable where a parent seeking removal has sole physical custody of his or her child. The husband contends that because the parties shared physical custody of the child, the judge should have applied the "best interest" standard articulated in Mason. Second, the husband argues that even if the judge properly employed the Yannas standard, she nevertheless abused her discretion in concluding that removal is in the child's best interests. Before engaging the husband's arguments, we briefly review the legal framework for evaluating removal petitions in the Commonwealth.

1. Applicable law. a. G. L. c. 208, § 30. General Laws c. 208, § 30, governs removal from the Commonwealth of children of divorced parents where one parent seeks to relocate without the consent of the other parent. It provides that "[a] minor child of divorced parents who is a native of or has resided five years within this commonwealth . . . shall not . . . be removed

---

[6] While the husband's notice of appeal states that he appeals the lower court judge's determinations as to both custody and removal, his brief focuses solely on the removal issue. Given the husband's focus on that issue, and the fact that "[t]he custody issues in this case are bound up with [the wife's] request to remove the children from the Commonwealth," Prenaveau v. Prenaveau, 75 Mass. App. Ct. 131, 138-139 (2009), we likewise fix our attention on the removal issue to resolve the husband's appeal.

out of this commonwealth . . . without the consent of both parents, unless the court upon cause shown otherwise orders." G. L. c. 208, § 30.[7]  "Upon cause shown" means that removal is in the best interests of the child.  Yannas, 395 Mass. at 711.  The statute is intended to "preserve the rights of the noncustodial parent and the child to maintain and develop their familial relationships, while balancing those rights with the right of the custodial parent to seek a better life for himself or herself."  Wakefield v. Hegarty, 67 Mass. App. Ct. 772, 775 (2006), citing Yannas, supra at 712.

We note at the outset that the removal statute does not, by its terms, apply to the parties' daughter:  she was born in Uganda, so she is not "a native" of the Commonwealth; likewise, she had "resided" here for less than five years when the wife

---

[7] Despite the removal statute's longevity -- it was first enacted in 1842 -- the substantive case law and principles did not begin to develop until the 1970s and 1980s.  Earlier cases simply acknowledged the statute's import in light of its plain meaning.  See, e.g., Hersey v. Hersey, 271 Mass. 545, 555 (1930) ("It is plain also that the respondent, by taking the child out of the Commonwealth, has not abided by the terms of [§ 30]").  This court first interpreted the statutory language in Rubin v. Rubin, 370 Mass. 857, 857 (1976), where we held that the phrase "upon cause shown" means the best interests of the child.  Even as of 1981, however, the Appeals Court observed that "Massachusetts authorities have not discussed in detail the factors to be weighed in deciding questions of removal."  Hale v. Hale, 12 Mass. App. Ct. 812, 815 (1981).  Hale was the first Massachusetts case to explore those factors in detail, as well as the first to adopt a "real advantage" analysis.  Id. at 815-820.  In doing so, Hale set the stage for this court's first in-depth discussion of the factors to be considered in evaluating a removal petition in Yannas.

filed her removal request. This does not mean, however, that the removal principles developed in cases under § 30 are not relevant or applicable here. This court previously has applied (or endorsed the application of) those principles in other circumstances where not every component of the removal statute was satisfied. See, e.g., Smith v. McDonald, 458 Mass. 540, 546 (2010), citing Wakefield, 67 Mass. App. Ct. at 775 (applying § 30 principles to child of unmarried parents, despite recognition that "a statute governing divorced children is not applicable directly to nonmarital children," in light of "the legal equality of nonmarital children"); Smith, supra at 546 n.13, quoting Altomare v. Altomare, 77 Mass. App. Ct. 601, 602-603 (2010) (although § 30 "applies only to relocation outside the Commonwealth, '[w]e apply out-of-State removal principles to in-State moves,' pursuant to common law, in cases where the move would disrupt significantly existing parenting arrangements, such as when the move is long-distance").[8]  In light of the considerable time the child has spent in Massachusetts, the meaningful ties she has developed while here, and the fact that the wife's proposed move would likewise "disrupt significantly existing parenting arrangements," Smith, supra at 546 n.13, we

---

[8] This approach is consistent with "the Commonwealth's broad policies of protecting the family unit and promoting the best interests of children." Upton v. JWP Businessland, 425 Mass. 756, 759 (1997).

analyze the wife's removal request using the same principles developed in cases under the removal statute.[9]

    b.  Removal analysis.  The "touchstone inquiry" is always whether removal is in a child's best interests.  Smith, 458 Mass. at 544.  This question "can be resolved only on a case by case basis," Yannas, 395 Mass. at 711, as the best interest standard "is one grounded in the particular needs and circumstances of the individual child in question" (citation omitted).  Mason, 447 Mass. at 183-184.  Still, this court has established certain guideposts to aid the judge's determination of this often difficult question.  Removal petitions in the Commonwealth are evaluated under one of two analyses, depending on the physical custody of the child.[10]  Where one parent has sole physical custody, a judge must evaluate that parent's request to remove the child under the "real advantage" analysis set forth in Yannas, supra at 711-712.  Where, on the other hand, the parents share joint physical custody, a judge must apply the "best interests" analysis articulated in Mason, supra

---

[9] It is also worth noting the children in Mason were, like the child in this case, "not born in the Commonwealth" and "had not resided in the Commonwealth for five years when the mother requested permission for removal."  Mason, 447 Mass. at 183 n.9.

[10] "Physical custody" refers to a child's residence with and supervision by one or both parents; it may be either sole or shared physical custody.  G. L. c. 208, § 31.  This is distinct from "legal custody," which refers to the "right[s] and responsibilit[ies] [of parents] to make major decisions regarding the child's welfare."  Id.

at 178.[11]  "The main distinction" between these analyses "comes down to the weight that should be assigned to the benefits that relocation would provide the parent seeking to move."  Prenaveau v. Prenaveau, 75 Mass. App. Ct. 131, 139 (2009).[12]

c.  Evaluating custody.  In deciding the applicable removal standard where there is no custody order the judge must first evaluate the parties' custodial arrangement and determine whether it more closely resembles sole or shared custody.  Sole physical custody "generally reflects that the children reside with only one parent 'subject to reasonable visitation by the other parent.'"  Mason, 447 Mass. at 182, quoting G. L. c. 208, § 31.  Shared physical custody, on the other hand, "contemplates that 'a child shall have periods of residing with and being under the supervision of each parent . . . assur[ing] . . . frequent and continued contact with both parents.'"  Mason, supra, citing G. L. c. 208, § 31.  Compare Abbott v. Virusso, 68 Mass. App. Ct. 326, 327 (2007), S.C., 450 Mass. 1031 (2008)

---

[11] We reiterated the distinction between these two analyses most recently in Smith v. McDonald, 458 Mass. 540 (2010).  There we noted that "[w]hen a parent has sole custody of a child . . . the analysis articulated in Yannas . . . applies" to that parent's removal request (citation omitted).  Id. at 547.  We observed that "[a] different analysis, more protective of the interests of the parent who is not relocating, is appropriate when the parents share joint physical custody."  Id. at 547 n.14, citing Mason, 447 Mass. at 184-185.

[12] Yannas recognizes that the best interests of a child can be greatly affected by the happiness of the primary caregiver where care or custody is not equal.  Yannas, 395 Mass. at 710.

(mother had sole physical custody of son where son resided primarily with her, and mother was his "primary care parent"), with Mason, supra at 178-179 (parents shared physical custody where "each parent took the part of a 'primary caretaker'" during marriage, and they "divided physical custody of the children approximately equally" after divorce).

In determining which manner of custody is present in a given case, the judge typically will look to an existing custody order between the parties. Even where there is such an order, though, the judge is still required to look beyond its characterization of custody (e.g., "the parties shall share physical custody"), in order to examine "the functional responsibilities and involvement of each parent" with their child in practice. Altomare, 77 Mass. App. Ct. at 605.[13]

---

[13] This functional assessment is necessary for two reasons. First, "custody judgments issued by the Commonwealth's courts do not consistently utilize" the categorical phrases "sole physical custody" or "shared physical custody" "as defined in G. L. c. 208, § 31." Abbott v. Virusso, 68 Mass. App. Ct. 326, 329 n.8 (2007), S.C., 450 Mass. 1031 (2008), and cases cited. As a result, "such categorizations . . . are utilized inconsistently, [and] can obscure more than they illuminate." Altomare v. Altomare, 77 Mass. App. Ct. 601, 605 (2010). Second, even where a custody order renders such a "categorical custodial determination," Woodside v. Woodside, 79 Mass. App. Ct. 713, 717 (2011), the actual practice of the parties may differ from what the order specifies. See, e.g., Altomare, supra at 606 (although divorce judgment provided for "shared legal and physical custody" of couple's children, "as a functional matter" caring for children was "the primary responsibility of the wife"); Abbott, supra at 327 (despite fact that divorce judgment provided that parties would "share physical custody of their

See id. at 605-606, and cases cited ("Our cases make clear that, in the context of spousal relocation, the label we attach to custodial status results from a factual inquiry").

In other cases, such as the instant one, there is no prior custody order to refer to, as a parent's removal request is concurrent with their divorce complaint. Still, the same principles apply; in deciding the appropriate removal standard, the judge must focus on "functional," as opposed to technical, "divisions in caregiving and parenting responsibilities." Woodside v. Woodside, 79 Mass. App. Ct. 713, 717 (2011). At this stage, "the judge must make a 'factual inquiry' to determine the approximate custodial arrangement and then apply the corresponding test" (citation omitted). Id.

i. Sole custody and Yannas. As we explained in Yannas, where one parent has sole physical custody, the interests of that child are "so interwoven with the well-being of the custodial parent" that "the determination of the child's best interest requires that the interests of the custodial parent be taken into account" (citation omitted). Yannas, 395 Mass. at 710. Yannas involves a two-part inquiry. First, a judge must examine "whether there is a good reason for the move, a 'real advantage'" to the parent. Id. at 711. This requires the

children," in practice son "continued to reside primarily with the mother," who was "the son's 'primary care parent'").

custodial parent to establish "a good, sincere reason for wanting to remove to another jurisdiction."  Id.  At this stage the judge must consider "the soundness of the reason for moving, and the presence or absence of a motive to deprive the noncustodial parent of reasonable visitation."  Id.

Second, if the custodial parent satisfies that threshold inquiry, the judge must then "consider[] collectively" the interests of the custodial parent, the noncustodial parent, and their child, and balance those interests to determine whether removal is in the best interests of the child.  Id. at 712. Pertinent considerations at this step include "whether the quality of the child's life may be improved by the change (including any improvement flowing from an improvement in the quality of the custodial parent's life), the possible adverse effect of the elimination or curtailment of the child's association with the noncustodial parent, and the extent to which moving or not moving will affect the emotional, physical, or developmental needs of the child."  Id. at 711.  "It is important to emphasize that consideration of the advantages to the custodial parent does not disappear" at this second step, "but instead remains a significant factor in the equation."  Pizzino v. Miller, 67 Mass. App. Ct. 865, 870 (2006).  Here the judge should also consider "[t]he reasonableness of alternative visitation arrangements."  Yannas,

395 Mass. at 711.  See Dickenson v. Cogswell, 66 Mass. App. Ct. 442, 447-453 (2006) (explaining appropriate consideration and weighing of interests under Yannas); Rosenthal v. Maney, 51 Mass. App. Ct. 257, 268-272 (2001) (same).

ii.  Joint custody and Mason.  In Mason, we explained that "[w]here physical custody is shared, the 'best interest' calculus pertaining to removal is appreciably different from those situations that involve sole physical custody."  Mason, 447 Mass. at 184.  Under Mason, "[t]he advantage to the moving parent becomes merely a relevant factor in the over-all inquiry of what is in the child's best interests."  Wakefield, 67 Mass. App. Ct. at 776.  This is so because with shared custody, "[n]o longer is the fortune of simply one custodial parent so tightly interwoven with that of the child; [here] both parents have equal rights and responsibilities with respect to the child[]. The importance to the child[] of one parent's advantage in relocating outside the Commonwealth is greatly reduced."  Mason, supra at 184-185.  See Smith, 458 Mass. at 547, n.14 (Mason is "more protective of the interests of the parent who is not relocating"); Prenaveau, 75 Mass. App. Ct. at 140 (Mason makes it "more difficult for the parent to justify the uprooting of the child").

2.  The standard applied by the judge.  Turning to the facts of this case, we must first determine which of the two

removal standards the trial judge applied below. In certain respects, it appears the judge thought she could apply neither. More than once during the trial proceedings the judge declared that she would apply a general "best interest" standard to the removal issue, on the ground that "there is no custody order."[14] And in her opinion authorizing removal, she explained that the two-step analysis of Yannas applies "if there is a current court order granting one party sole physical custody." As we have stated, although an existing custody order is of course a common feature of removal cases, the fact that one does not exist does not preclude the application of the appropriate removal standard.[15,16]

---

[14] The judge first said this in her order on the parties' joint motion seeking clarification as to the standard the guardian ad litem should apply to the removal issue. She wrote that "[a]lthough the [guardian ad litem] shall gather facts and report as to [the wife's] advantage by the move, the standard to be used as there is no custody order should be 'best interest.'" The judge then reiterated this point at trial. There is no indication that the judge, when mentioning the "best interest" standard, was referring to the Mason analysis.

[15] The husband maintains that the stipulation itself is an existing custody order. The stipulation specifically states that its status as a "[t]emporary [o]rder or [j]udgment" is "subject to the approval of the [c]ourt." There is no indication, however, that the probate judge approved the stipulation because it lacks the judge's signature or some other indicia of court approval. Unlike the judge's various orders, which are reflected on the docket as such, the parties' agreement was docketed only as a "Stipulation of the Parties." And not once during the trial proceedings did the judge refer to the stipulation as an order; indeed, as we just noted, the judge

It is clear from the judge's written decision that she thoroughly examined the parties' allocation of custody and parenting responsibilities. See Woodside, 79 Mass. App. Ct. at 717. The judge made sixty-one factual findings concerning only custody, with many addressing how the parties have divided the child's care. The judge concluded that "[a]lthough [the h]usband was involved in caring for [the child] during the marriage, [the w]ife has always been primarily responsible for her physical and emotional care, as well as day-to-day tasks such as feeding, clothing, and bathing." More significantly, in the opinion's section discussing removal, the judge analyzed the issue solely in terms of the two steps of the Yannas analysis, concluding that "although G. L. c. 208, § 30, does not apply, because there is a real advantage to the [w]ife in the proposed removal, and because the removal is consistent with [the child]'s best interests, it would bring about the same result if it did." See Prenaveau, 75 Mass. App. Ct. at 140 (court's conclusion that Mason was "the proper lens through which to

repeated -- despite the stipulation's existence -- that "there is no court order" regarding custody.

[16] Yannas itself involved an instance where there was no prior custody order; there, as here, the wife's removal petition was part of her divorce action. Yannas, 395 Mass. at 705-706. Likewise, there was no earlier custody order in Wakefield v. Hegarty, 67 Mass. App. Ct. 772, 772-773 (2006), in which the mother sought removal while her custody case was still pending. In both cases the courts still proceeded to apply the "real advantage" standard.

evaluate the judge's ruling . . . reinforced by the fact that the judge made no attempt to justify the removal decision using a Yannas analysis" [citation omitted]). We have already stated that although the removal statute does not apply directly here, the same removal principles do, including the "real advantage" analysis of Yannas. On this score, we agree with the wife that Yannas, not Mason, is "the proper lens through which to evaluate the judge's ruling" in this case.
See Prenaveau, supra.

3. The merits. The husband does not challenge the judge's pertinent factual findings, so we review both her determination of the applicable removal standard, and her ultimate conclusion as to whether removal is in the child's best interests, for an abuse of discretion. Mason, 447 Mass. at 184. "[A] judge's discretionary decision constitutes an abuse of discretion where [the appellate court] conclude[s] the judge made 'a clear error of judgment in weighing' the factors relevant to the decision . . . such that the decision falls outside the range of reasonable alternatives" (citation omitted). L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

The husband first argues that the judge abused her discretion in applying the "real advantage" analysis under Yannas. He maintains that because the parties shared physical custody of the child, the judge should have evaluated

the wife's removal petition using the "best interest" standard
of Mason, which affords less weight to the advantages a move
offers the parent seeking removal.  In support of his contention
of shared physical custody, the husband relies primarily on the
stipulated parenting plan the parties filed in the trial court
following their respective divorce filings, which states that
the husband and the wife "shall share custody" of the child.
According to the husband, the stipulation, which was "in effect
for over three years as of the trial judge's Judgment,"
allocates parenting responsibilities "almost equally."[17]

The judge clearly considered the stipulation, having
detailed its contents both in her recitation of the case's
procedural history and in an individual factual finding.  Yet
the judge also found that the husband travels frequently for
work, and when he does he "communicates with [the child]
infrequently" and misses allotted parenting time that he has not
sought to make up.  With respect to the parties' parenting
responsibilities, the judge found that the wife has always been
the child's primary caregiver.  The husband, in contrast, is
"not seeking sole physical custody of [the child] and does not
propose that he should be her primary caregiver."   See,

---

[17] The husband also points to the fact that the guardian ad
litem, in her report on the removal issue, characterized the
parties' arrangement as "coparenting."  The judge was not
required to adopt the guardian ad litem's characterization.
Mason, 447 Mass. at 186.

e.g., Woodside, 79 Mass. App. Ct. at 718 (no abuse of discretion in applying Yannas where "mother was the primary caregiver"); Wakefield, 67 Mass. App. Ct. at 776-777 (same). Likewise, although a hallmark of shared custody is the parents' "ability and desire to cooperate amicably and communicate with one another to raise the[ir] child[]," Mason, 447 Mass. at 182, the judge found that "the parties struggle to communicate effectively regarding parenting issues, and that [the h]usband often fails to communicate with [the w]ife."  See Katzman v. Healy, 77 Mass. App. Ct. 589, 596 & n.7 (2010) (questioning propriety of judge's "Mason-like approach to removal" where cooperation necessary for shared physical custody was "obviously not present"); Prenaveau, 75 Mass. App. Ct. at 143 (same).  As we noted, the husband does not contest these findings.

The Mason analysis generally applies where "neither parent has a clear majority of custodial responsibility" (citation omitted).  Mason, 447 Mass. at 185.  Although the terms of the parties' stipulation may have approximated shared custody, the judge concluded (in light of the above facts) that in practice, their custodial arrangement more closely resembled the sole custody of Yannas.  Past cases support the judge's conclusion on this point.  See, e.g., Altomare, 77 Mass. App. Ct. at 602, 606 (wife had sole custody where, despite prior custody order stating that "[t]he parties shall have shared . . . physical

custody," children were "as a functional matter" "under the primary responsibility of the wife"); Abbott, 68 Mass. App. Ct. at 327, 330 (applying Yannas to mother's request to remove son where, despite prior custody order stating that parties were to "share physical custody of the children," son "continued to reside primarily with the mother who . . . [was] the son's 'primary care parent'").  Because the judge's decision plainly does not "fall[] outside the range of reasonable alternatives" here, L.L., 470 Mass. at 185 n.27, we conclude she did not abuse her discretion in analyzing the wife's removal petition using the "real advantage" standard of Yannas.

Turning to the judge's application of the Yannas analysis, the husband does not argue that the first step of Yannas is not satisfied -- namely, that there is a real advantage to the wife in moving to Germany.  As the judge found, the wife has secured a well-paying job, something she has been unable to accomplish in Massachusetts, despite having "applied for over 400 jobs," and her entire support system is there.  There is also nothing to suggest that the wife's move is motivated by a desire to deprive the husband of parenting time with the child.  Yannas, 395 Mass. at 711.

Instead, the husband only challenges the judge's subsequent conclusion, formally the second step of the Yannas analysis, that removal is in the child's best interests.  The husband

contends that the judge abused her discretion in reaching that conclusion because she failed to consider adequately how removal would impact or benefit the child, and failed to consider reasonable alternative visitation arrangements.  To recount, at this stage the judge must collectively consider the interests of all those involved -- child, custodial parent, and noncustodial parent -- and balance those interests in order to determine whether removal is in the best interests of the child.  Yannas, supra at 712.  The "judicial safeguard" of each person's interest "lies in careful and clear fact-finding."  Id.

a.  Interests of the child.  In assessing the interests of the child, a judge is bound to consider "whether the quality of a child's life may be improved by the change (including any improvement flowing from an improvement in the quality of the custodial parent's life)," the effect of the move on "the child's association with the noncustodial parent," as well as its effect on "the emotional, physical, or developmental needs of the child."  Yannas, 395 Mass. at 711.  See Dickenson, 66 Mass. App. Ct. at 449-450.

With respect to the effect of the move on the child's quality of life and her "emotional, physical, or developmental needs," the judge found that in Germany the child would be attending better schools, and would again be treated by her long-time pediatrician.  She found further that in Germany the

child would "have support from the loving extended family with whom she has had frequent and extensive contact since birth," including her maternal grandmother, with whom the child "is very close."[18]  Although the judge observed that the child struggles during transitions between the parties' households, nothing in the record suggests that she would likewise struggle with a move to Germany.  To the contrary, the child has been visiting the country throughout her life, including for extended periods.  She is fluent in German, has already attended German schools, and keeps in touch with her friends there (who would also be her classmates if she were to return to Germany).

More significantly, the judge observed that the child's quality of life will be "particularly" improved "through the impact of the improvement in [the w]ife's quality of life."  In Massachusetts, the wife could not meet her expenses, and lived in poverty.  By contrast, the judge found that the wife's well-paying job in Germany would permit her to support herself and

---

[18] The husband protests that the judge failed to find that the child's connections in Germany are in any way more substantial than her connections in Massachusetts.  Indeed, the judge found that the child and the husband spend meaningful time with each other and the husband's family.  But "[t]here is nothing in the record to indicate that, here, those relationships are so important to [the child's] emotional well-being that they deserve primacy over [her] relationship with [her] mother, who ha[s] been the primary custodial parent throughout [the child's] life."  See Rosenthal v. Maney, 51 Mass. App. Ct. 257, 272 (2001) (reversing judgment denying removal).

the child, while continuing to fulfil her role as the child's primary caregiver, as the position would enable the wife "to work from home most of the time." Compare Wakefield, 67 Mass. App. Ct. at 777 (mother's "income will increase, and she will be able to work from home and spend more time with her daughter"), and Rosenthal, 51 Mass. App. Ct. at 268 (family's financial situation "greatly improved" by move), with Dickenson, 66 Mass. App. Ct. at 449 ("The child's financial security would . . . be diminished by the move," as it placed mother in "a less-stable employment relationship"). In addition, the wife has virtually no support network in Massachusetts because she "has few acquaintances" here and "feels lonely and isolated," but in Germany she would reunite with her supportive extended family. The trial judge concluded that this improvement in the wife's emotional situation would also "benefit [the child] significantly." See Pizzino, 67 Mass. App. Ct. at 870 ("Common sense demonstrates that there is a benefit to a child in being cared for by a custodial parent who is fulfilled and happy rather than by one who is frustrated and angry").

Notwithstanding the direct and indirect benefits a move to Germany would offer the child, the judge also found that the child has a "loving relationship" with her father, and recognized that moving to Germany would have a "detrimental effect" on that relationship.

b.  <u>Interests of the custodial parent</u>.  "Because the best interests of a child are so interwoven with the well-being of the custodial parent, the determination of the child's best interest requires that the interests of the custodial parent be taken into account."  <u>Yannas</u>, 395 Mass. at 710.  The judge thoroughly considered the wife's interests in moving to Germany. The judge found that despite the wife's professional background and diligent efforts, she has been unable to find a job in Massachusetts commensurate with her education and experience, rendering her continued presence here unsustainable.[19]  The wife has been offered a position in Germany with a salary that would allow her to "support herself and [the child] without child support from [the h]usband," and benefits that include use of a company vehicle, ample vacation time, health insurance and retirement benefits, and the ability to work from home most of the time.  As mentioned, the judge concluded that a move to Germany offers the wife significant improvements to her financial and emotional health.  See, e.g., <u>Williams</u> v. <u>Pitney</u>,

---

[19] It is noteworthy that although the wife works in the highly-specialized field of public relations in the Middle East (the trial judge observed this made it "unsurprising that her job search has been difficult"), the wife also applied for positions for which "she was overqualified, such as office assistant positions," and even looked for work "in Germany or the Middle East that would allow her to work from Massachusetts."  The trial judge thus concluded that the wife made "a good faith effort" to find gainful employment in Massachusetts.

409 Mass. 449, 456 (1991) (mother would benefit from move, "would be close to friends and relatives who would provide emotional support after the move, and . . . would be better able to secure employment").

c. <u>Interests of the noncustodial parent</u>. Last, the judge must consider the interests of the noncustodial parent. <u>Yannas</u>, 395 Mass. at 711. This includes assessing "whether reasonable 'alternative visitation arrangements' might achieve ongoing and meaningful contact appropriate to the circumstances." <u>Rosenthal</u>, 51 Mass. App. Ct. at 271, quoting <u>Yannas</u>, <u>supra</u>.

The judge found that the husband cares for the child deeply, and recognized the "detrimental effect" separation would have on their relationship. She also acknowledged the husband's concerns "regarding his ability to communicate with [the child] on a regular basis given the six-hour time difference between Massachusetts and Germany," as well as the various travel costs the husband would incur during his visitation periods. The judge concluded that, in addition to frequent telephone and Internet contact, aligning the husband's visitation with the child's extended vacation periods will lessen the detrimental effects of their separation, by providing them with lengthier, and hence more meaningful, visits together. Contrast <u>Dickenson</u>, 66 Mass. App. Ct. at 449, 451 (under mother's proposed

visitation schedule, which would entail "frequent 'red-eye' flights" between Massachusetts and California, "someone would inevitably be tired and stressed . . . thereby diminishing the quality of the visits"). In light of the travel costs the husband would incur in facilitating visitation with the child, the judge did not order child support.

d. Balancing the interests. After consideration of the parties' and child's respective interests, the judge must balance those factors to determine whether removal is in the best interests of the child. Yannas, 395 Mass. at 711-712. A judge's determination of the best interests of the child represents a "classic example of a discretionary decision" in which "much must be left to the trial judge's experience and judgment" (citation omitted). Adoption of a Minor (No. 2), 367 Mass. 684, 688 (1975).

We discern no abuse of discretion with respect to the judge's consideration and balancing of the interests at stake here. The judge recognized that she was faced "with two difficult alternatives." Granting the wife's removal request would have the negative impact of permanently altering the child's relationship with her father, who cares for her deeply. Yet the judge also determined, on the basis of uncontested factual findings, that "allowing the current shared parenting schedule is financially untenable for the parties." Financial

struggle -- "poverty," as the wife described her current lifestyle -- is in the interest of no child.  As in Yannas, a move to Germany "would be to the advantage of the wife, financially, emotionally, and socially," and would inure to the child's benefit as well.  Yannas, 395 Mass. at 712.  Removal has been deemed appropriate in similar circumstances in past cases.  See, e.g., Williams, 409 Mass. at 456 (affirming grant of removal where mother "would be close to friends and relatives who would provide emotional support after the move, and . . . the mother would be better able to secure employment"); Wakefield, 67 Mass. App. Ct. at 774, 777-778 (removal allowed where mother, child's primary caretaker, sought to return to home country where she "would enjoy greater family support," and "would be working at an increased salary" in position that would enable her "to work from home and spend more time with her daughter").[20]  Accordingly, we affirm the judgment of the trial judge in its entirety.

So ordered.

---

[20] In contrast, these are not the circumstances in which removal has been deemed not to be in a child's best interest. See, e.g., Dickenson v. Cogswell, 66 Mass. App. Ct. 442, 449, 451, 453 (2006) (affirming denial of removal by mother, who was custodial parent, where move would diminish child and mother's financial security, "would take [mother] away from her support network of friends and family," and would require child to take "frequent 'red-eye' flights across the country, including trips by himself with layovers").

GANTS, C.J. (concurring, with whom Gaziano, J., joins).  I agree with the court that the judge here did not abuse her discretion in concluding that removal from the Commonwealth is in the child's best interests.  I write separately only because I disagree with the artificially binary decision-making framework that has emerged from Yannas v. Frondistou-Yannas, 395 Mass. 704 (1985), and Mason v. Coleman, 447 Mass. 177 (2006), and that the court applies today.  Under that framework, the removal analysis depends on whether the parent seeking to remove the child has "sole physical custody" of the child, in which case the judge must follow the "real advantage" analysis in Yannas, or whether the parents share "joint physical custody" of the child, in which case the judge must follow the "best interests" analysis in Mason.  I believe that the ultimate "touchstone" in all removal cases, whether one parent has sole physical custody or both parents share physical custody, is always the best interests of the child.  Smith v. McDonald, 458 Mass. 540, 544 (2010), quoting Custody of Kali, 439 Mass. 834, 840 (2003).  I would therefore discard the Yannas-Mason framework in favor of a single, uniform standard -- the best interests of the child -- to be applied to all removal cases, recognizing that the "real advantage" to the parent seeking removal is a factor that must be considered under that standard.

The current binary decision-making framework has two substantial flaws. First, it places too much weight on the threshold determination as to whether one parent has "sole physical custody," meaning that "[the] child . . . reside[s] with and [is] under the supervision of one parent, subject to reasonable visitation by the other parent," G. L. c. 208, § 31; or both parents have "shared physical custody," meaning that "[the] child . . . ha[s] periods of residing with and being under the supervision of each parent." Id. This is a false dichotomy, which fails to reflect the many variations on the theme of sole and joint physical custody that often play out in our increasingly complicated lives. In many cases, as here, custody is shared, but not equally, and the percentage of time a child spends with a parent may vary over time, depending on a parent's work and travel obligations, or perhaps on a parent's (or grandparent's) health.

We have seen judges struggle to fit cases into one of these two categories. See, e.g., Prenaveau v. Prenaveau, 75 Mass. App. Ct. 131, 140 (2009) ("While the co-parenting arrangement . . . does not fit neatly into the traditional taxonomy, it can perhaps best be understood as an attempt at approximating joint custody . . . "). Recognizing the inherent inflexibility of these two categories, our appellate courts have held that whether a physical custody arrangement is "sole" or "joint"

should be determined with respect to "the functional responsibilities and involvement of each parent."  Altomare v. Altomare, 77 Mass. App. Ct. 601, 605 (2010).  This is a wise approach.  But any such nuanced, functional assessment is severely limited by the strict binary framework the court applies today.  Ultimately, a judge will have to categorize a physical custody arrangement as either "sole" or "joint," which will in turn mandate the analysis the judge must follow.

The inflexibility of the Yannas-Mason framework is on full display in this case where, as in many cases, the parenting arrangement resists easy classification.  Unlike Yannas, this is not a case where one parent has sole physical custody.  Yannas, 395 Mass. at 705, 706 (mother awarded sole physical custody).  Nor is it a case like Mason, where the parents share physical custody equally.  Mason, 447 Mass. at 179 (parents divided physical custody "approximately equally" pursuant to stipulation).  Here, pursuant to the parties' stipulated parenting plan, the child spends approximately sixty per cent of her time with her mother and forty per cent with her father.  In practice, the percentage of time spent with the mother was higher because, although the father has a loving relationship with the child, he travels frequently.  Based on these and other facts, the judge decided that the mother is the child's primary caregiver and analyzed it -- as she is required to do under the

court's binary framework -- as if it were a straightforward, uncomplicated case where one parent does in fact have sole physical custody.

The second flaw with the Yannas-Mason framework is that it invites the misperception that the best interests of the child is "the touchstone inquiry" only where there is joint physical custody, Smith, 458 Mass. at 544, quoting Custody of Kali, 439 Mass. at 840, and that the "real advantage" to the parent seeking removal is the more important consideration where one parent has sole physical custody. In endorsing this framework, the court has lost sight of the guiding principles behind our two decisions in Yannas and Mason.

In Yannas, 395 Mass. at 711, we emphasized that "the central question" in removal cases is "how [the] 'best interests' [of the child] are to be determined." We applied the "real advantage" standard only because we believed that it was the most accurate reflection of the child's best interests under those circumstances; we recognized that, where one parent has sole physical custody, "the best interests of [the] child are so interwoven with the well-being of the custodial parent, [that] the determination of the child's best interest requires that the interests of the custodial parent be taken into account." Id. at 710, quoting Cooper v. Cooper, 99 N.J. 42, 54 (1984).

In Mason, 447 Mass. at 184, we took a different approach to our determination of the child's best interests, emphasizing that "[w]here physical custody is shared, the 'best interest' calculus pertaining to removal is appreciably different," because the child's best interests are "[n]o longer . . . so tightly interwoven" with the interests of one parent over another.

Together, these two decisions reiterate what judges have always known:  that when determining the best interests of the child, facts matter.  "The 'best interest' calculus" is a dynamic one that must be adapted to each case, assigning different weight to different factors depending on the facts. In removal cases, whether the parent seeking removal can show a "real advantage" from the move is only one among many factors contributing to the child's best interest; it is often important, but may not be in every case.  Yannas and Mason do not announce separate standards but are merely applications of the same standard, which should in every case guide our analysis:  whether removal is in the best interests of the child.  See Prenaveau, 75 Mass. App. Ct. at 139 ("[Yannas and Mason] do not articulate distinctly different tests.  In each case, one question was preeminent:  is removal in the best interests of the children?").

In _Yannas_, 395 Mass. at 711, we recognized that removal cases "present difficult choices." Faced with these choices, we declined to "apply a fixed but arbitrary rule," preferring instead to resolve the issues "on a case by case basis." _Id_. It is ironic that, today, the court invokes our decision in _Yannas_ to preserve a fixed and inflexible framework for resolving these difficult cases.

I emphasize that my disagreement with the court's approach does not mean I disagree with the outcome of this case. Because the second step of the _Yannas_ analysis requires a determination of the child's best interests, a judge is usually able -- whether under _Yannas_ or _Mason_ -- to reach the decision that best serves the interests of the child. See, e.g., _Dickenson_ v. _Cogswell_, 66 Mass. App. Ct. 442, 449, 453 (2006) (analysis under second step of _Yannas_ "independently establishe[d] that removal was not justified," because not in best interests of child). See also _Yannas_, 395 Mass. at 711 ("That the move is in the best interests of the custodial parent does not mean that it is automatically in the best interests of the child"). Indeed, that is exactly what happened here. Having applied the "real advantage" standard, the judge ultimately resolved the case under what I believe is the proper analysis, finding that removal was in the child's best interests. But judges should

not be required to engage in analytical gymnastics in order to arrive at the best outcome.

Nor can we ignore the risk that this formalistic approach will, in some cases, derail the proper analysis. How a case is categorized under the Yannas-Mason framework can have serious consequences for the parties involved, in that it alters the balance that must be struck between the interests of each parent. Under Yannas, it is the parent who seeks removal whose interests are accorded greater weight. Prenaveau, 75 Mass. App. Ct. at 139. But under Mason, it is the opposite: the parent who opposes removal enjoys the "more protective" standard. Smith, 458 Mass. at 547 n.14. Thus, whether the child can be removed may very well hinge on which side of an unrealistic binary -- "sole physical custody" or "joint physical custody" -- the case happens to fall.

To abandon the Yannas-Mason framework would not mean that we are abdicating our responsibility to provide appellate guidance to judges who must make difficult removal decisions. In Yannas, apart from the "real advantage" to the parent seeking removal, we identified several other relevant factors that must be considered, including "whether the quality of the child's life may be improved by the change . . . , the possible adverse effect of the elimination or curtailment of the child's association with the noncustodial parent, and the extent to

which moving or not moving will affect the emotional, physical, or developmental needs of the child."  Yannas, 395 Mass. at 711. How these factors are to be balanced will depend on the facts of each case.

Where the form of the common law no longer serves its function, it is this court's responsibility to change it.  This case well illustrates the limits of the Yannas-Mason framework; we should not allow it to linger any longer.  It is time that we abandon it and resolve all removal cases under the same standard:  whether removal is in the best interests of the child.  As part of that "best interests" determination, a judge should be permitted to consider the "real advantage" of the move to the parent seeking removal of the child, regardless of whether that parent has sole or joint physical custody, and accord that factor as much weight as is warranted by the specific facts of the case.  As the court acknowledges, the determination whether removal is in the child's best interests is a "classic example of a discretionary decision," in which "much must be left to the trial judge's experience and judgment" (citation omitted).  Adoption of a Minor (No. 2), 367 Mass. 684, 688 (1975).  But in its strict adherence to the Yannas-Mason framework, the court chooses to constrain that equitable discretion, and in a way that interferes with, rather than assists, sound decision-making.